IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THOMAS MCEACHIN,                           )
                                           )    Civil Action No. 07 - 954
              Plaintiff,                    )
                                           )
v.                                         )    Magistrate Judge Lisa Pupo Lenihan
                                           )
HARRY E. WILSON, Superintendent; DR.       )
GINCHEREAU; PRISON HEALTH                  )
SERVICES; MIKE HICE; ROBERT TRETINIK,      )
Health Care Administrator; and DR. BASTICH,)
in their official and individual capacities,)
                                           )
              Defendants.                   )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Thomas McEachin, is a state prisoner currently confined at the State Correctional Institution at Fayette, Pennsylvania (SCI-Fayette). He commenced this action pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, complaining that he has been denied adequate medical care in violation of the Eighth Amendment of the United States Constitution. He brings this action against Harry E. Wilson, Superintendent; Dr. Eugene Ginchereau, Assistant State Medical Director; Prison Health Services; Mike Hice, Clinical Coordinator; Robert Tretinik, Corrections Health Care Administrator and Dr. Bastich, contract physician, in their official and individual capacities. Presently pending before the court are Defendants' Motions for Summary Judgment. For the reasons that follow, Defendants' Motions will be granted except as to Defendants Hice and Tretinik as to Plaintiff's claims regarding delay in receiving his contact lens. An appropriate order follows.

## A. Standard of Review - Summary Judgment

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. Rule Civ. Proc. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) (party can move for summary judgment by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case.").  The moving party bears the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the non-moving party must set forth specific facts showing that there is a genuine issue for trial or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Fed. Rule Civ. Proc. 56(c).  *See also* Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).  An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The inquiry, then, involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' "  Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990), *cert. denied*, 501 U.S. 1218 (1991) (quoting Anderson, 477 U.S. at 251-52).  If a court concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted.  Anderson, 477 U.S. at 249-50.

### B. Material Facts

The facts are related herein in the light most favorable to Plaintiff as the non-moving party.  Thomas McEachin is a prisoner previously confined at the State Correctional Institution at Fayette (SCI-Fayette).   During the relevant time period, Defendant Harry E. Wilson was the Superintendent at SCI-Fayette. Defendant Robert Tretinik was the Healthcare Administrator at SCI-Fayette.  Defendant Eugene H. Ginchereau, M.D. was the Assistant State Medical Director for the DOC.  Defendant PHS was the company that contracted with the DOC to provide medical care to inmates.  Defendant Michael Hice was an employee at PHS who acted as an administrative assistant and clinical consultant.  Mike Hice and PHS are referred to collectively as the Medical Defendants. Harry Wilson, Robert Tretinik and Eugene Ginchereau are referred to collectively as the DOC Defendants. Defendant Dr. Bastich failed to answer McEachin's complaint and McEachin secured a default against him.

Plaintiff suffers from a progressive eye disease called keratoconus, which is an abnormality of the eye involving the cornea.  Plaintiff first was diagnosed with keratoconus disease in 1996 while in custody at SCI Graterford.  The illness has caused thinness of his corneas, which can lead to permanent loss of sight.  Plaintiff also has a history of seizure disorder, which increases the risk of permanent loss of sight through damage to the cornea.  The primary method of treatment for keratoconus is a contact lens.  In severe cases, a gas permeable lens of a special design is required to fit over the conical shape of the eye.  Eyeglasses will not provide any treatment to a person with severe keratoconus due to the conical shape of the cornea (doc. no. 49-2, p. 13).

Before he was confined at SCI-Fayette, Plaintiff was under the care of Dr. Nick Siviglia, at the Wills Eye Hospital in Philadelphia.[1]  In 1996, Dr. Siviglia fitted Plaintiff with specially-designed contact lenses, Ni-Cone Keratoconus and Post PK lenses, U.S. Patent No. 4,601,556.  With these lenses, his right eye was correctable to see 20/200 plus one and his left eye was correctable to 20/30 visual acuity (doc. no. 49-2, p. 16).  These lenses are designed to provide fluid retention to control the cone of the cornea and provide maximum visual acuity.  At the time he was transferred to SCI-Fayette, Plaintiff was legally blind in his right eye and his left eye was corrected to 20/70, but only through the use of a specially designed contact lens.  His right eye was beyond correction through the use of contact lenses; the only treatment option available to correct the vision in his right eye was corneal transplant surgery.  Corneal transplant surgery usually is not considered if vision can be corrected through the use of contact lenses.  A corneal transplant becomes medically necessary when the cornea becomes too thin, which increases the risk of perforation, which causes loss of the eye (doc. no. 49-2, p. 13).

On September 21, 2004, Plaintiff was transferred to SCI-Fayette and was placed on Administrative Custody (AC) status in the Restricted Housing Unit (RHU) for classification purposes.  Plaintiff informed Defendant Tretinik of his medical eye disease on September 27, 2004 via an inmate request to staff.  Defendant Tretinik responded to Plaintiff on September 28, 2004 by telling him to sign up for sick call and stating "I agree with the PA, in that the inmate is now under the care of SCI-Fayette's medical director, and is no longer at SCI-Albion…[h]e will continue to receive the medical care he needs verses [sic] wants."

On September 30, 2004, Dr. Bastich, the then on site optometrist, examined

_____

1.   Dr. Siviglia also is the President and Chief Executive Officer and Director of Science and Research of Lancaster Contact Lens, Inc., which is located in Lancaster, Pennsylvania.

McEachin and referred him to Regional Eye Associates (REA) for a keratoconus evaluation. Dr. David McClure, a board certified ophthalmologist with REA, examined Plaintiff on November 15, 2004. On the Consultation Record following Plaintiff's examination, Dr. McClure made two notations regarding his examination of Plaintiff: 1) "needs orb scan measurements" [for left eye]; and 2) "should have PK PGD for definitive RX" (doc. no. 49-8, p. 58). On the same document, someone else wrote, "penetrating keratoplasty, OD, right eye, corneal transplant, per Dr. McClure not emergent at this time."

In a letter to Dr. Herbick[2] dated November 16, 2004, Dr. McClure stated the following.

> Thank you for consulting us regarding Thomas McEachin. He has significant keratoconus in both eyes. On the right he has scarred and flattened cornea from previous eye drops. I don't think that much would be improved by a contact lens. He would probably do better to have penetrating keratoplasty. In the left eye we could not obtain keratometry readings with either manual or automatic machinery. We would suggest that he have Orb scan data obtained. From this he could have a gas permeable lens constructed to match his keratoconus. . . . I would suggest that he discontinue the use of the contact lens in the left eye in order to prevent significant scarring on the left (doc. no. 49-13, p. 87).

On November 17, 2004, Dr. Herbik approved a consultation with the UPMC Eye Clinic for an orb scan, which was done on January 6, 2005. On November 22, 2004, Dr. Herbik ordered that Plaintiff's contact lens in his left eye be confiscated after receiving a recommendation from the consult that the contact lens in the left eye be discontinued. Plaintiff requested contact lenses on November 24, 2004, December 1, 2004, December 15, 2004, January 18, 2005, January 25, 2005, and February 1, 2005. On January 8, 2005, Dr. Herbik noted that Plaintiff had requested

---

2. Michael Herbik, M.D., was the Medical Director at SCI-Fayette and also served as Regional Medical Director for PHS.

contact lenses but that they were still awaiting results from the orb scan.  The orb scan results were reviewed with Plaintiff by Dr. Herbik on January 25, 2005.  On February 23, 2005, Dr. McClure saw Plaintiff and recommended a gas permeable lens for his left eye.  On the same date, Dr. Herbik noted that the lenses would be ordered.

On April 25, 2005, Dr. McClure again saw Plaintiff and gave him a trial set of soft lenses.  Plaintiff's contact lens solution was confiscated when he returned to the prison and, after April 2005, Plaintiff was not provided with contact lens solution during visits with Dr. McClure. On April 26, 2005, Plaintiff reported that, because he did not have his lens care kit, when he took his lens out he left it on the sink.  When he woke up, the lens had dried out and was torn.

On April 27, 2005, Dr. McClure sent a letter to Dr. Herbik.

Thomas McEachin has been fit with a soft contact lens trial 7.3 base curve, 8.0 diameter and -4.00 power.  With this he is able to see 20/100 at distance.  Enclosed are two other trial lenses (one flatter, one steeper) which can be tried at 1-2 weeks to evaluate for better fit. This can be performed by staff at your facility. Once we have a reasonable fit, over refraction can be performed and then we can order a contact lens using those parameters.  Please return the trial lenses to the Waynesburg office (doc. no. 49-8, p. 67).

On May 3, 2005, P.A. Meyer distributed a trial lens to Plaintiff.  When Plaintiff received the lens, the contact lens was torn and appeared to have been damaged when the lid was screwed on to the contact lens case.

On July 14, 2005, Plaintiff had an examination with the on-site optometrist, Dr. Bastich.  On that date, Plaintiff alleges that Defendant Hice said something to the optometrist which led the optometrist to provide him with glasses instead of contact lenses.  On that date, the eye doctor failed to record any visual acuity levels, made no mention of glasses, and failed to sign the report. After Defendant Hice interfered with his eye exam, Defendant Tretinik became involved and

confirmed Plaintiff was going to get eyeglasses and was not going to get contact lenses.  Defendant

Tretinik also threatened Plaintiff to accept eyeglasses.  Plaintiff refused to accept the eyeglasses and

requested to see the eye doctor for confirmation of his treatment needs.  Defendant Hice refused his

request.  In a grievance, Plaintiff stated the following.

> On 7/29/05 Mike Hess[sic] along with c/o Anderson came to my cell
> in the RHU.  Mike Hess [sic] told me he had a pair of eye glasses for
> me.  After I tried the glasses on my vision wasn't correct "any" at all.
> Rather things looked even more unfocus. I informed Mike Hess [sic]
> about this and asked him could I see the eye doctor about this.  He
> told me that I'm not allowed to see the eye doctor and that I had
> better accept the eyeglasses or go [] blind.  I asked him does it make
> sense to accept glasses that does nothing for my vision.  He told me
> to sign a refusal form.  I again stated I would like to see the eye
> doctor about this. That's when c/o Anderson told me in a threatening
> tone that I better sign the refusal form or he would for me (doc. no.
> 54-2, p. 22).

In response, Defendant Tretinik stated the following.

FINDING OF FACT

1.      The inmate states he put the glasses on and his vision
        was not corrected.

2.      It usually takes two weeks or longer for a person's
        eyes to adjust to any change in glasses.

3.      The inmate has been evaluated on several occasions
        by the eye doctor.  He is the one who ordered the
        glasses instead of the contacts.

4.      If the inmate wants his glasses, he needs to write a
        DC 135A to PHS.

Conclusion: No merit.

 (doc. no. 54-2, p. 24).  After Plaintiff refused the glasses, Defendant Hice spoke with the PHS

Medical Director, Dr. Herbik, about Plaintiff's refusal of the eyewear.  Dr. Herbik informed Hice

that Plaintiff did need a contact lens.

Plaintiff appealed the grievance to Superintendent Wilson informing him that Tretinik interfered with his medical treatment and should not have been involved in responding to his grievance (doc. no. 54-2, p. 26).  He further informed the Superintendent that he did not order eyeglasses and that Tretinik made that up to deny him adequate medical treatment.  On October 11, 2005, Superintendent Wilson responded as follows.

> You have been evaluated by the eye doctor and were issued the eyeglasses with the prescription as ordered by the eye doctor.  You claim that Mr. Tretenik [sic] is denying you medical care.  Mr. Tretenik [sic] did not conduct your eye exam nor prescribe your glasses.  He answered your grievance as the administrator of the medical department who is responsible for the daily operation being in compliance with DOC policy and medical protocol.
>
> It is a medical fact that if a prescription changes your eyes must adjust to this change.  Since you decided to order glasses instead of contacts you can write to PHS to obtain your glasses (doc. no. 54-2, p. 27).[3]

Plaintiff appealed the denial of his grievance on November 11, 2005.  On January 23, 2006, Plaintiff was sent out to see Dr. McClure.  In a letter to Dr. Herbick dated January 25, 2006, McClure stated the following.

> Thomas McEachin was seen in our office on 1/23/06.  He has increasing keratocunus and we cannot obtain any readings on the keratometry today.  I think this is the cause of his visual symptoms although he does have some increasing asthenopic symptoms associated with early presbyopia.
>
> I don't think he is going to maintain a pair of soft lenses.  I don't think a soft lens or a gas permeable lens in the right eye will make any difference with his overall vision.  I think a gas permeable fit would be a very complicated procedure as we have no real

---

3.  In the meantime, on October 7, 2005, Plaintiff's previous eye doctor, Dr. Siviglia, sent the prison a specially designed contact lens for Plaintiff's left eye, contact lens cleaner, and contact lens wetting a soaking solution, all free of charge.  These items were returned to Dr. Siviglia a week later.

baseline cornea keratometry readings and it would end up being trial and error.  If you have an optometrist at the facility who feels comfortable with gas permeable keratoconus fit, why not go ahead and make arrangements for him to do this.  If you would like us to go ahead with things, let us know, as we would need to bring a couple of keratoconus fitting sets to the office the day of his exam.

 I have not talked to Mr. McEachin regarding the options available or treatment of keratocunus.  Please let us know if you would like us to do anything in particular (doc. no. 49-8, p. 70).

On February 1, 2006, Defendant Ginchereau answered Plaintiff's grievance appeal

as follows.

 1. On January 23, 2006, the inmate was seen by David C. McClure, M.D. an ophthalmologist, who advised a referral to an optometrist for gas permeable keratoconus fit contact lenses.

 2. In a telephone conversation with Dr. Michael Herbick, the Medical Director of SCI-Fayette, on January 31, 2006, I was assured that this recommendation would be executed.

 I believe this action resolves this inmate's grievance.  No other medical evaluation or treatment is indicated at this time (doc. no. 54-2, p. 34).

On February 3, 2006, Plaintiff was told he would receive a contact lens.  On February 22, 2006, Plaintiff was fitted with a gas permeable lens by Dr. McClure.  In a letter dated February 23, 2006, Dr. McClure informed Dr. Stanley Falor to contact his office to order the lens (doc. no. 49-8, p. 73).  Two months passed and on May 1, 2006, in response to questioning from the Bureau of Health Care Services, Defendant Tretinik stated that Plaintiff was referred to the optometrist at the end of March and that his contact lens would be provided in two weeks (doc. no. 54-2, p. 39).  As of August 7, 2006, still not having received his contact lens, Plaintiff wrote to Defendant Ginchereau inquiring about its status (doc. no. 54-2, p. 41).  Defendant Ginchereau responded to

Plaintiff as follows:  "I have been in communication with the medical team at SCI-Fayette who has assured me that a consult has been approved to have you fitted for appropriate contact lenses."  Doc. No. 54-2, p. 43.  Plaintiff filed another grievance on September 6, 2006 (doc. no. 54-4, p. 2).  The response to the grievance confirms that as of September 21, 2006, Plaintiff's contact lens had not even been made (doc. no. 54-4, p. 3).

      Plaintiff was seen by Dr. McClure on August 28, 2006 and there was not a good fit for either eye so trial Synergeyes lenses were to be ordered by REA (doc. no. 49-8, p. 75). Plaintiff did not try a Synergeyes lens because an optometrist in the REA Morgantown office indicated the lens was "terrible." Dr. Goellner of REA saw Plaintiff on October 5, 2006. On November 8, 2006, Plaintiff received bilateral contact lenses, a contact lens case and solution.

      On November 20, 2006, Plaintiff complained of left eye pain and was diagnosed with a corneal abrasion/conjunctivitis and given treatment.  On March 1, 2007, Plaintiff was directed to not wear his contact lens until he could be re-examined on March 4, 2007.  On March 6, 2007, Plaintiff complained of left eye irritation and was seen by P.A. Cowden who noted that the contact lens did not appear to be torn.  On July 26, 2007, Dr. Herbik approved a consultation with REA for keratoconus and a follow up contact lens recheck. The appointment was originally scheduled for August 13, 2007 but did not take place until September 10, 2007.  Dr. McClure saw Plaintiff on September 10, 2007 and noted that he "seems to have reasonable visual acuity" (doc. no. 49-15, p. 6).  On May 19, 2008, Dr. McClure examined Plaintiff and noted that Plaintiff had significant corneal scarring on the right which precluded good functional vision without corneal grafting (doc. no. 49-8, p. 81).  He further noted that Plaintiff needed a newer type of gas permeable lens in his left eye.  Dr. McClure did not see Plaintiff again after May 19, 2008.

On August 29, 2008, P.A. Cowden requested approval for the corneal transplant.  Dr. Herbik approved on September 2, 2008 and final PHS approval was provided on September 22, 2008. On December 2, 2008, Plaintiff underwent a corneal transplant in his right eye.

### C. Liability under 42 U.S.C. § 1983

In order to assert liability pursuant to 42 U.S.C. § 1983, a plaintiff must meet two threshold requirements.  He must allege: 1) that the alleged misconduct was committed by a person acting under color of state law; and 2) that as a result, he was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States.  West v. Atkins, 487 U.S. 42 (1988); Parratt v. Taylor, 451 U.S. 527, 535 (1981), *overruled in part on other grounds*, Daniels v. Williams, 474 U.S. 327, 330-331 (1986).

Plaintiff's claims concerning his medical treatment invoke the protections of the Eighth Amendment.  In order to make out a prima facie case that a prison official's actions violate the Eighth Amendment's prohibition against cruel and unusual punishment, an inmate must show two elements.  First, a prisoner must show that the condition, either alone or in combination with other conditions, deprived him of "the minimal civilized measure of life's necessities," or at least a "single, identifiable human need."  Wilson v. Seiter, 501 U.S. 294 (1991) (citing Rhodes v. Chapman, 452 U.S. 337, 347 (1981)).  Second, an inmate must demonstrate deliberate indifference to prison conditions on the part of prison officials.  Farmer v. Brennan, 511 U.S. 825 (1994); Wilson, 501 U.S. at 297; Rhodes, 452 U.S. at 347.

To state an Eighth Amendment violation in the context of medical treatment, an inmate must show prove two elements:  1) plaintiff was suffering from a "serious medical need," and 2) prison officials were deliberately indifferent to the serious medical need.  Gamble v. Estelle, 429 U.S. 104 (1977).  The first showing requires the court to objectively determine whether the medical

need was "sufficiently serious."  A medical need is "serious" if it is one that has been diagnosed by

a physician as mandating treatment, or one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention.  Gaudreault v. Municipality of Salem, 923 F.2d 203,

208 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991); Monmouth County Correctional Institutional

Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), *cert. denied*, 486 U.S. 1006 (1988).

        The second prong requires a court <u>subjectively</u> to determine whether the officials

acted with a sufficiently culpable state of mind.  Deliberate indifference may be manifested by an

intentional refusal to provide care, delayed medical treatment for non-medical reasons, a denial of

prescribed medical treatment, or a denial of reasonable requests for treatment that results in suffering

or risk of injury.  Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993).  The Supreme Court has

cautioned that an inadvertent failure to provide adequate medical care cannot be said to constitute

an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind.

Gamble, 429 U.S. at 105-106.

> . . .  Thus, a complaint that a physician has been negligent in
> diagnosing or treating a medical condition does not state a valid
> claim of medical mistreatment under the Eighth Amendment.
> Medical malpractice does not become a constitutional violation
> merely because the victim is a prisoner.  In order to state a cognizable
> claim, a prisoner must allege acts or omissions sufficiently harmful
> to evidence deliberate indifference to serious medical needs.  It is
> only such indifference that can offend "evolving standards of
> decency" in violation of the Eighth Amendment.

Gamble, 429 U.S. at 106.[4]

        Moreover, in order to establish personal liability against a defendant in a section 1983

action, a defendant must have <u>personal</u> involvement in the alleged wrongs; liability cannot be

---

4.  *See also* Daniels v. Williams, 474 U.S. 327, 332-34 (1986) (negligence is not compensable as
a Constitutional deprivation).

predicated solely on the operation of *respondeat superior*. Rizzo v. Goode, 423 U.S. 362 (1976). Accordingly, individual liability can be imposed under section 1983 only if the state actor played an "affirmative part" in the alleged misconduct. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir. 1986). *See also* Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir.2004) (holding that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference).

      1.    Defendant Wilson

        Prior to his retirement, Harry Wilson was the Superintendent at SCI-Fayette. He held that position from August 30, 2004, until his retirement on April 4, 2008. As Superintendent, Mr. Wilson did not directly provide medical care to Plaintiff. Rather, Plaintiff was treated by medical professionals employed by the DOC and/or PHS. As Superintendent, Wilson's role in providing inmates with medical care was limited to ensuring that inmates were seen by the medical department; he did not have the authority or expertise to make medical decisions and could not determine what

type of corrective eyewear was appropriate for any inmate.

        Defendant Wilson's involvement in Plaintiff's claim primarily stems from his decision denying Plaintiff's grievance regarding the incident in July of 2005 when Plaintiff was prescribed glasses rather than contacts due to the alleged interference by Defendants Hice and Tretinik. Plaintiff claims that Defendant Wilson should not have relied upon Defendant Tretinik, an individual he knew was not licensed to provide medical care, in denying the grievance and should have credited Plaintiff's averments regarding his needed medical care. Further, in regard to Plaintiff's grievance, Plaintiff claims that Wilson did not ensure that he had access to medical care

and essentially deferred to Defendant Tretinik's assessment of Plaintiff and failed to address Plaintiff's request to see the eye doctor.

These claims, at most, sound in negligence, not deliberate indifference. It is not unreasonable for the Superintendent to credit the claims of the facility health care administrator. As Superintendent, Wilson was responsible for answering all grievance appeals and must be able to reasonably rely on individuals in charge of inmates' concerns. Requiring the Superintendent to independently evaluate every grievance appeal would lead to a breakdown in prison management. As stated by the Court of Appeals for the Third Circuit:

> . . . If a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. Moreover, under such a regime, non-medical officials could even have a perverse incentive not to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability.
>
> Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official like Gooler will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004).

The general standard for a § 1983 deliberate indifference claim made against a prison official focuses on what the official actually knew: "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837. In the context of a deliberate indifference claim based on failure to provide adequate medical treatment,

it is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute deliberate indifference. Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir.1993) ("[T]he law is clear that simple medical malpractice is insufficient to present a constitutional violation."). Moreover, "[I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.' " Gamble, 429 U.S. at 105. Deliberate indifference requires obduracy and wantonness, Whitley v. Albers, 475 U.S. 312, 319 (1986), which equals recklessness or a conscious disregard of a serious risk. Farmer, 511 U.S. at 842.

Deliberate indifference can be shown where the prison official: 1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; 2) delays necessary medical treatment based on a non-medical reason; or 3) prevents a prisoner from receiving needed or recommended medical treatment. Monmouth County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326, 346-47 (3d Cir. 1987)). Deliberate indifference also may be found where the prison official persists in a particular course of treatment "in the face of resultant pain and risk of permanent injury." Napoleon, 897 F.2d at 109-11.

The record before this court simply does not show that Defendant Wilson acted with deliberate indifference. CHCA Tretinik's response to Plaintiff's grievance indicated that the eye doctor had prescribed glasses. It was reasonable for Superintendent Wilson to rely on this response; there is nothing in the record to indicate that Wilson had any reason to suspect that Tretinik was lying or that Plaintiff was not receiving health care from the appropriate personnel. It is unreasonable for this Court to impose a duty upon the Superintendent to independently review medical records when responding to inmate grievances; that is what the healthcare administrator does. Without any reason to believe that person is lying, there is no basis upon which to impose

liability.  The record shows that, to the best of Wilson's knowledge, Plaintiff was provided with the medical care proscribed by the doctors and/or other medical professionals while he was confined at SCI-Fayette; he has and had no information that would lead him to believe otherwise.  The record shows that Wilson did not impede Plaintiff's access to medical care or interfere with the care prescribed by the medical professionals.  Contrary to Plaintiff's assertions, it is not reasonable to expect a superintendent to independently review medical files to confirm an inmate's statements regarding his need for medical care.  Nor is it unreasonable for a superintendent to rely on the facility CHCA to determine the level of care needed by an inmate.  While it is unfortunate that Plaintiff was without contacts for fifteen months, it does not appear to be the result of deliberate indifference on the part of Defendant Wilson.  *Cf* Marshall v. Tessema, Civil Action No. JFM-08-3269, 2009 WL 3756825, 3 (D. Md. Nov. 5, 2009) (holding that confusion among health care providers as to who was to provide inmate with medically necessary rigid gas permeable contact lenses for nearly one year was not result of deliberate indifference sufficient to constitute a violation under the Eighth Amendment).

Moreover, to the best of Wilson's knowledge, no medical professional recommended a corneal transplant for Plaintiff from the time Plaintiff arrived at SCI-Fayette until the date of Wilson's retirement.  To the extent such a recommendation was ever made, it was never brought to Wilson's attention.  Despite Plaintiff's assertion that he discussed his need for a corneal transplant with Defendant Wilson, such discussion does not impose upon Defendant Wilson a duty to independently investigate such a claim.  More importantly, while there is some indication in the record that Plaintiff would benefit from a corneal transplant, there is nothing indicating that any doctor or other medical personnel informed Defendant Wilson that such a procedure was medically necessary for Plaintiff.  While a corneal transplant is in fact an organ transplant, such a procedure

is a treatment of last resort if eyesight can be corrected through the use of contact lenses.  Here, Plaintiff's left eye was correctable through the use of contact lenses; the fact that he did not receive a permanent adequate contact lens for fifteen months does not require a determination that he should have had a corneal transplant.  Dr. McClure testified that, while Plaintiff might benefit from such a procedure, and that such procedure would be a definitive treatment for his right eye, he never recommended that Plaintiff undergo a corneal transplant (doc. no. 49-8).  He further testified that he had recommended a cornea transplant for inmates while he was employed in Louisiana.

Indeed, the record taken in a light most favorable to Plaintiff establishes **at most** with respect to Wilson mere negligence.  The subjective prong requires Plaintiff to show that Defendant Wilson "possessed 'a sufficiently culpable state of mind in denying medical care' ... greater than mere negligence."  Miller v. Calhoun County, 408 F.3d 803, 813 (6th Cir. 2005).  The "deliberate indifference" standard for purposes of liability under section 1983 is a stringent standard of fault requiring proof that a defendant disregarded a known or obvious consequence of his action.  Board of County Commissioners of Bryan County v. Brown, 520 U.S. 397, 410 (1997).  The defendant must be both aware of facts from which the inference could be drawn that a substantial harm exists and he must also draw the inference.  Farmer, 511 U.S. at 837.  An official is not deliberately indifferent if "he fails to alleviate a significant risk that he should have identified."  Id.  Medical malpractice may give rise to a tort claim in state court but does not necessarily rise to the level of a federal constitutional violation.  Kost v. Kozakiewicz, 1 F.3d 176, 185 (3d Cir. 1993); Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993).

The Supreme Court explained the difference between negligence and constitutional claims in Estelle v. Gamble, 429 U.S. 97, 104 (1978).  In that case, the prisoner, Gamble, was injured when a bale of cotton fell on him while he was unloading a truck.  He went to the unit

hospital where a medical assistant checked him for a hernia and sent him back to his cell.  He

returned to the hospital where he was given pain pills by an inmate nurse and then was examined

by a doctor. The following day, his injury was diagnosed as a lower back strain; he was prescribed

a pain reliever and a muscle relaxant.  Over the course of several weeks, Gamble was seen by

several doctors who prescribed various pain relievers and provided him with medical work excuses.

Ultimately, despite his protests that his back hurt as much as it had the first day, medical staff

certified Gamble to be capable of light work.  During the next two months, Gamble received a

urinalysis, blood test, blood pressure measurement, and pain and blood pressure medication.

Subsequently, a medical assistant examined Gamble and ordered him hospitalized for treatment of

irregular cardiac rhythm.

       The Supreme Court held that Gamble's allegations failed to state a claim upon which

relief could be granted against the defendant, both in his capacity as a treating physician and as the

medical director of the Corrections Department.

> Gamble was seen by medical personnel on 17 occasions spanning a
> 3-month period . . ..  They treated his back injury, high blood
> pressure, and heart problems. Gamble has disclaimed any objection
> to the treatment provided for his high blood pressure and his heart
> problem; his complaint is "based solely on the lack of diagnosis and
> inadequate treatment of his back injury."  The doctors diagnosed his
> injury as a lower back strain and treated it with bed rest, muscle
> relaxants and pain relievers.  Respondent contends that more should
> have been done by way of diagnosis and treatment, and suggests a
> number of options that were not pursued.  The Court of Appeals
> agreed, stating:  "Certainly an x-ray of (Gamble's) lower back might
> have been in order and other tests conducted that would have led to
> appropriate diagnosis and treatment for the daily pain and suffering
> he was experiencing."  But the question whether an X-ray or
> additional diagnostic techniques or forms of treatment is indicated is
> a classic example of a matter for medical judgment. A medical
> decision not to order an X-ray, or like measures, does not represent
> cruel and unusual punishment. At most it is medical malpractice, and

<u>as such the proper forum is the state court under the Texas Tort
Claims Act</u>.

<u>Gamble</u>, 427 U.S. at 107 (internal citations omitted) (emphasis added).

Like the prisoner in <u>Gamble</u>, Plaintiff's medical records indicate that he received extensive medical treatment for his eye condition.  While an intentional refusal to provide <u>any</u> medical treatment to an inmate suffering from a serious medical need manifests deliberate indifference and is actionable under the Eighth Amendment, the Eighth Amendment does not require that a prisoner receive every medical treatment that he requests or that is available elsewhere.[5]  A disagreement as to the appropriate choice of medical treatment does not give rise to a constitutional violation because the "right to be free from cruel and unusual punishment does not include the right to the treatment of one's choice."  <u>Layne v. Vinzant</u>, 657 F.2d 468, 473 (1st Cir. 1981).  Mere disagreements over medical judgment do not state Eighth Amendment claims as there are typically several acceptable ways to treat an illness.  <u>White v. Napoleon</u>, 897 F.2d 103, 110 (3d Cir. 1990) (citations omitted).  *Accord* <u>Young v. Quinlan</u>, 960 F.2d 351, 358 n.18 (3d Cir. 1992) (an inmate's disagreement with prison personnel over the exercise of medical judgment does not state claim for relief under section 1983).

Hence, Plaintiff has not established that Defendant Wilson knew of and disregarded an excessive risk to inmate health or safety where the record would not permit a rational factfinder to conclude that Defendant Wilson acted with deliberate indifference, where Defendant Wilson

---

5. *See, e.g.*, <u>Dias v. Vose</u>, 960 F.2d 143 (1st Cir. 1991); <u>United States v. DeCologero</u>, 821 F.2d 39, 42 (1st Cir. 1987) ("though it is plain that an inmate deserves adequate medical care, he cannot insist that his institutional host provide him with the most sophisticated care money can buy"); <u>Ferranti v. Moran</u>, 618 F.2d 888, 891 (1st Cir. 1980) (a dispute over the exercise of professional medical judgment may present a colorable claim of negligence, but it falls short of alleging a constitutional violation).

could have reasonably concluded that Plaintiff was being adequately treated by medical personnel. Even if Defendant Wilson could not have reasonably concluded that Plaintiff was being adequately treated by medical personnel, then at most Defendant Wilson made such a conclusion unreasonably, which is to say, Defendant Wilson should have known that Plaintiff needed contacts rather than glasses.  However such a "should have known" standard only amounts to negligence, *see, e.g.*, Farmer, 511 U.S. at 860 (Thomas, J. concurring) ("Petitioner's suggested 'should have known' standard is nothing but a negligence standard"), which is not sufficient under Section 1983 to establish deliberate indifference.  Gamble, 429 U.S. at 105-06.

To survive Defendant Wilson's motion for summary judgment, Plaintiff is required to point to some evidence to show that Wilson knew or was aware of a substantial risk of serious harm to Plaintiff.  Singletary v. Pennsylvania Dept. of Corrections, 266 F.3d 186, 192 n.2 (3d Cir. 2001)).  Specifically, there is no record evidence that suggests that Defendant Wilson knew that Plaintiff faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it or that he had any reason to know that he faced any substantial harm. There is nothing in the record to indicate that Defendant Wilson had any authority to initiate a corneal transplant for Plaintiff.  Nor is there any evidence that he interfered with Plaintiff's ability to receive a corneal transplant. In light of the record, the court does not believe a rational trier of fact could find that Defendant Wilson was deliberately indifferent to this plaintiff's serious needs. Accordingly, Defendant Wilson is entitled to summary judgment. *Accord* Mason v. Sandham, Civil Action No. S-04-1123, 2007 WL 2531524 (E. D. Cal. Aug. 31, 2007) (granting medical defendants'

motions for summary judgment with respect to inmate plaintiff's claim of delay in approving corneal transplant surgery).[6]

    2.    <u>Defendant Ginchereau</u>

        Defendant Dr. Eugene Ginchereau is the Assistant State Medical Director with the DOC's Bureau of Health Care Services (BHCS).  Prior to the initiation of the instant lawsuit, Dr. Ginchereau was never asked to address issues relating to a corneal transplant for inmate Plaintiff. Dr. Ginchereau does not specialize in eye care. Thus, he deferred to the opinion of the treating specialist as to what types of corrective eyewear would be appropriate for treating Plaintiff.  He would also defer to the treating specialist as to when a corneal transplant would/should be provided.

        Dr. Ginchereau became aware of Plaintiff's concerns in late 2004/early 2005 when he was asked to evaluate the appeal of Plaintiff's grievance no. 125215.  In response to this grievance, Dr. Ginchereau determined that Plaintiff had just been seen by Dr. McClure on January 23, 2005 and that he recommended a referral for gas permeable contact lenses (doc. no. 49-13, p. 49).  He further telephoned Dr. Herbick who told him that this recommendation would be executed. Plaintiff contacted Dr. Ginchereau through letter dated April 2, 2006 inquiring about the status of his lenses.  On May 8, 2006, Dr. Ginchereau wrote to Plaintiff that Defendant Tretinik had informed him that Plaintiff had been referred to an optometrist for his contact lenses and that Tretinik had informed him that the lenses would be ready in two weeks (doc. no. 49-13, p. 63).  Plaintiff again contacted Dr. Ginchereau through letter dated August 7, 2006 inquiring about the status of his

---

6.  *See also* <u>Goodrich v. Clinton County Prison</u>, 214 Fed. Appx. 105, 112, 2007 WL 148688, 6 (3d Cir. 2007) (noting that non-physician defendants cannot be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison's medical staff and holding that such defendant cannot be considered deliberately indifferent for failing to second-guess the medical staff's appraisal of the situation).

lenses.  On August 21, 2006, Dr. Ginchereau wrote to Plaintiff that he had been in communication

with the medical team at SCI-Fayette who assured him that he had been approved for a consult to

be fitted for appropriate contact lenses (doc. no. 49-13, p. 66).

Plaintiff seeks to hold Defendant Ginchereau liable on the basis that he failed to

follow-up to ensure a contact lens was provided in two weeks as he stated in his correspondence to

Plaintiff.  As with Defendant Wilson, Dr. Ginchereau had no information or belief that Plaintiff was

not receiving appropriate medical care.  Nor did he have any knowledge or information that would

lead him to question the information given to him by Defendant Tretinik. When he became involved,

Dr. Ginchereau made appropriate inquiries, was informed from appropriate personnel that Plaintiff

was receiving appropriate care, and communicated his findings to Plaintiff.  The fact that he did not

follow up to ensure Tretinik's information was correct does not even sound in negligence, much less

exhibit the demanding standard of deliberate indifference required to establish an Eighth

Amendment violation.  As such, Dr. Ginchereau is entitled to summary judgment as to Plaintiff's

claims.[7]

3.      Defendant Tretinik

Robert Tretinik is the Corrections Health Care Administrator (CHCA) at SCI-Fayette

and has been so employed since 2003; prior to that time he was the CHCA at SCI-Wayesburg.

---

7.  Moreover, there is evidence in the record that as of April 9, 2009, Dr. Nicholas Scharff, Chief
of Clinical Services for the DOC Bureau of Health Care Services, was advised on McEachin's
situation and specifically stated that "there is no ill effect from delaying a corneal transplant in
this condition."  (Doc. no. 49-15, p. 64).  Dr. Ginchereau was specifically advised of these
findings.

Although he is a Registered Nurse, Tretinik has not practiced nursing for quite some time due to his administrative duties.  Tretinik's job duties as CHCA are purely administrative and he does not perform any nursing functions at all.  As CHCA, Tretinik is not supposed to make medical decisions and does not have authority to determine what care an inmate will receive.  Rather, as  CHCA, Tretinik was responsible for ensuring that inmates at SCI-Fayette had access to medically necessary care.  In addition, as CHCA, Tretinik was involved in processing candidates for organ transplants (doc. no. 49-13, p. 22).  Tretinik also was responsible for responding to inmate requests to staff addressed to the medical director concerning medical issues and he evaluated and reviewed inmate grievances regarding medical concerns.

Health care administrators do not prescribe medications or make decisions regarding the course of treatment prescribed to inmates.  As such, courts generally have found that prison health care administrators did not act with "deliberate indifference" when the prisoner plaintiff is receiving treatment from the prison doctor.  *See, e.g.* Miller v. Hoffman, 1999 WL 415397, *11 (E.D. Pa. June 22, 1999) (collecting cases).  Notwithstanding, health care administrators are not immune from liability; where the facts indicate personal involvement in an inmate's allegedly deficient medical treatment, courts have refused to grant summary judgment in favor of the administrator.  *See, e.g.*, Sappington v. Ulrich, 868 F. Supp. 194 (E.D. Tex. 1994); Kaminsky v. Rosenblum, 737 F. Supp. 1309 (S.D.N.Y. 1990).[8]

In the instant action, Plaintiff alleges that Defendant Tretinik interfered with his access to eye care on July 14, 2005 and with his access to medical information from the medical

---

8.   *See also* Cooper v. Schriro, 189 F.3d 781, 783-784 (8th Cir. 1999) (prisoner's allegations that health care administrator refused him treatment after he filed medical service request regarding painful decayed and cracked teeth stated cause of action for deliberate indifference to serious medical need in violation of Eighth Amendment).

director.  Defendant Tretinik allegedly threatened Plaintiff to accept ineffective eyeglasses and then allegedly told Plaintiff he never would receive contacts.  Plaintiff further claims that Defendant Tretinik intercepted his request slips to medical staff (doc. no. 54-8, p. 2).  Plaintiff  was not sent out to see an eye doctor to address the inadequacy of his glasses until January of 2006.

Deliberate indifference can be shown where prison authorities prevent an inmate from receiving a recommended treatment.  *See* Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979).  The record shows that there are questions of fact regarding Defendant Tretinik's alleged involvement in Plaintiff's July 14, 2005 eye examination and whether he had any ability or authority to influence the course of medical treatment Plaintiff received.  In addition, there are questions of fact regarding Tretinik's responses indicating that Plaintiff would be getting his lens within two weeks when the record does not show that any lens had been ordered.  In addition, there are questions of fact as to whether Defendant Tretinik interfered with Plaintiff's ability to see the eye doctor prior to his exam on January 23, 2005.  Thus, Defendant Tretinik is not entitled to summary judgment with respect to Plaintiff's claim regarding the delay in receiving his contact lenses.

With respect to Plaintiff's claim regarding his corneal transplant, on October 2, 2007, Dr. McClure wrote Dr. Herbick that a corneal transplant could conceivably improve Plaintiff's visual acuity but that such procedure was purely elective as he had functional vision in his left eye (doc. no. 49-15, p. 10).  Defendant Tretinik is cc'd on this letter.  There is no evidence that a corneal transplant was explored at this time.  Notwithstanding, according to DOC policy, it is the facility medical director's responsibility to identify an inmate as a candidate for an organ transplant (doc. no. 49-13, p. 22).  During the relevant time period, the facility medical director was Dr. Herbick, who is not a named defendant in this action.  The CHCA's responsibility is to notify the Clinical

Coordinator of the Bureau of Health Care Services when the facility medical director identifies an inmate as a candidate for a transplant.  DOC Policy Access to Health Care, 13.2.1, Section 1(B) (doc. no. 49-13, p. 22).  There is nothing in the record to indicate that Defendant Tretinik had any authority to initiate a corneal transplant for Plaintiff.  Nor is there any evidence that he interfered with Plaintiff's ability to receive a corneal transplant.  Accordingly, Defendant Tretinik is entitled to summary judgment as to Plaintiff's claim regarding a corneal transplant.

       4.    <u>Defendant Hice</u>

       Defendant Michael Hice, a PHS employee, was the clinical coordinator at SCI-Fayette during the relevant time period.  Specifically, he acted as an administrative assistant for PHS and was responsible for scheduling consults for inmates with outside medical specialists.  Hice testified that when a recommendation came back from the outside consultant, it automatically was delivered to the facility medical director, Dr. Herbick, who was responsible for any follow up resulting from the recommendation (doc. no. 49-11, p. 7).  He further testified that REA was responsible for the ordering and distribution of specialty contact lenses to insure proper fitting for such lenses (doc. no. 49-11, p. 9).

       Plaintiff contends that Defendant Hice intentionally interfered with his medical treatment.  Specifically, McEachin testified that the prison eye doctor told him he needed contact lenses.  However, McEachin testified that he was prevented from getting contact lenses by Defendant Hice during his visit with the eye doctor on July 14, 2005.  McEachin testified that Defendant Hice said something to the optometrist which led the optometrist to provide him with glasses instead of contact lenses.  These allegations raise a question of fact as to whether Defendant Hice intentionally interfered with Plaintiff's medical care regarding his contact lenses.  Therefore, Defendant Hice is not entitled to summary judgment as to Plaintiff's claim regarding his contact

lenses.  Again, however, there is nothing in the record to indicate that Defendant Hice had any authority to initiate a corneal transplant for Plaintiff.  Nor is there any evidence that he interfered with Plaintiff's ability to receive a corneal transplant.  Accordingly, Defendant Hice is entitled to summary judgment as to Plaintiff's claim regarding a corneal transplant.

     5.    <u>PHS</u>

     That leaves Defendant Prison Health Services (PHS).  In <u>Monell v. New York City Dep't of Social Servs.</u>, 436 U.S. 658 (1978), the Supreme Court held that municipalities and other local governmental units are "persons" subject to liability under 42 U.S.C. § 1983.  In so ruling, however, the Court declared that municipal liability may not be premised on the mere fact that the governmental unit employed the offending official, *i.e.*, through application of the doctrine of *respondeat superior*.  Instead, the Court concluded that a governmental unit may be liable under section 1983 only when its "policy" or "custom," whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, directly inflicted the injury.  <u>Monell</u>, 436 U.S. at 694.  The "official policy" requirement distinguishes acts of the municipality from acts of employees of the municipality, thereby limiting liability to action for which the municipality is actually responsible, *i.e.*, acts that the municipality has officially sanctioned or ordered.  *Id*.  In <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480 (1986), the Court further clarified that "municipal liability under § 1983 attaches where--and only where--a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  *Id*. at 483 (citation omitted).

     Moreover, mere identification of a policy or custom is not enough to establish municipal liability; a plaintiff also must establish causation.  In this regard, a plaintiff carries the burden of demonstrating a "plausible nexus" or "affirmative link" between the municipality's custom

or policy and the constitutional deprivation at issue.  Thus, a municipality is not liable for the alleged misconduct of its employees absent a link or nexus between the custom or policy and the employee's misconduct because such liability would be predicated upon the doctrine of *respondeat superior*. Monell, 436 U.S. at 691.  *Accord* Board of County Com'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 405 (1997) (a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights).

Just as a municipal corporation is not vicariously liable upon a theory of respondeat superior for the constitutional torts of its employees, a private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights.  *See, e.g.*, Harvey v. Harvey, 949 F.2d 1127, 1129 (11th Cir. 1992) (noting that every circuit court to consider the issue has extended the holding in Monell to private corporations as well) (citing cases).  *Accord* Street v. Corrections Corp. of Am., 102 F.3d 810, 818 (6th Cir. 1996); Baker v. Simmons, 65 Fed. Appx. 231, 2003 WL 21008830 (10th Cir. May 6, 2003).  Consequently, in order to assert a claim against PHS, Plaintiff must show that a constitutional deprivation resulted from an official custom or policy or, alternatively, from the actions of an official with "final authority to establish municipal policy." Pembaur, 475 U.S. at 480-81.

As set forth above, PHS cannot be liable for any constitutional deprivations suffered by Plaintiff unless "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton, 489 U.S. at 385.  The Supreme Court has instructed that "policy" is made when a decisionmaker possessing final authority over the subject matter issues an official proclamation, policy, or edict.  Pembaur, 475 U.S. at 481.  Custom can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is

so well-settled and permanent as virtually to constitute law.  <u>Monell</u>, 436 U.S. at 690.  *See also*

<u>Bielevicz v. Dubinon</u>, 915 F.2d 845, 850 (3d Cir. 1990).  If a constitutional tort committed by an

employee of Prison Health Services was not a result of the policy or custom of the entity, then PHS

can not be liable. Liability for the independent actions of a health service employee would be based

upon *respondeat superior* and thus not actionable under § 1983.

   In the case at bar, Plaintiff has not identified any policy or custom attributable to PHS

with respect to his medical care.  In this regard, Plaintiff has not set forth any evidence of any similar

incidents that have occurred in the past, save for the one in which he was involved, to prove some

pattern of conduct that could establish a custom or policy.  It is well settled that a single incident of

unconstitutional behavior, without any direct involvement by a municipal policy maker, is not

sufficient to impose liability.  <u>Pembaur</u>, 475 U.S. at 479; <u>City of Oklahoma v. Tuttle</u>, 471 U.S. 808,

822 (1985); <u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 637 (3d Cir. 1995) (plaintiff's mere

assertion of the incident at issue, plus vague assertions about the police department's failure to

investigate other wrongdoings, did not provide sufficient proof of a policy or custom to satisfy the

dictates of section 1983).[9]

   Moreover, the record does not support liability against PHS on the basis of any failure

to properly train or supervise theory.  In this regard, to establish liability on a failure to train theory,

Plaintiff must set forth specific allegations that the need for more or different training was so

obvious and so likely to lead to the violation of constitutional rights that the policymaker's failure

---

9.  *See also* <u>Bryan County</u>, 520 U.S. at 409 (a single decision by municipal lawmakers can
trigger municipal liability only if the decision itself is found to be unconstitutional, *i.e.*, a
reasonable policymaker should have concluded that the "plainly obvious" consequence of his or
her decision would be the deprivation of a third party's federally protected rights).

to respond amounts to deliberate indifference.  Brown v. Muhlenberg Township, 269 F.3d 205, 216 (3d Cir. 2001) (citing City of Canton, 489 U.S. at 390 (1989)).

This is unlike the situation presented in Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996), *cert. denied*, 117 S. Ct. 1086 (1997).  In that case, the plaintiff claimed that the city maintained a custom or policy of tolerating the use of excessive force by its officers.  As proof of the city's acquiescence in such policy, the plaintiff in Beck presented evidence of a series of actual, written civilian complaints of similar nature containing specific information pertaining to the use of excessive force and verbal abuse by the same officer.  All but one of the complaints had been transmitted through the police department chain of command to the Chief of Police.  In addition, the plaintiff presented annual department reports detailing the high rate of excessive force incidents. After reviewing this evidence, the Court of Appeals for the Third Circuit concluded that, because the complaints came in a narrow period of time and were of a similar nature, a reasonable jury could have inferred that the Chief of Police of Pittsburgh and his department knew, or should have known, of the officer's violent behavior in arresting citizens.  In addition, the Court noted that, although department reports highlighted concerns of excessive force, the City took no action in response to such concerns.  Based on this record, the court determined that Beck had presented sufficient evidence from which a reasonable jury could have inferred that responsible policymakers for the City of Pittsburgh knew about, and acquiesced in, the tacit use of excessive force by its police officers.  *Id*. at 976.

In the case at bar, however, Plaintiff has presented no evidence to demonstrate that his alleged injuries resulted from PHS' "deliberate indifference" as demonstrated by its failure to train or supervise.  In resolving the issue of liability against PHS, Plaintiff must first show that the training program for PHS contract physicians is inadequate. If "the need for more or different

training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights,

[then] the policymakers of the city can be said to have been deliberately indifferent to the need."

City of Canton, 489 U.S. at 390.  *See also* Simmons v. City of Philadelphia, 947 F.2d 1042, 1064

(3d Cir.1991) (to establish deliberate indifference in failure to train, plaintiff must show that

policymakers knew of magnitude of problem and either deliberately chose not to provide officers

with training or acquiesced in a longstanding practice or custom of not providing training).

Specifically, he has not identified any specific training, supervision or disciplinary

actions that were deficient.  Moreover, unlike the plaintiff in Beck, he fails to make any specific

factual allegations that PHS is liable based on a policy or custom of refusing adequate eye care to

inmates with keratocunus.  Finally, he fails to allege that any similar conduct has occurred in the

past such that PHS should have been aware that an unreasonable risk of harm existed.  *See* Reitz v.

County of Bucks, 125 F.3d 139, 145 (3d Cir. 1997) ("the record before us is critically deficient of

evidence on which a jury reasonably could have based its conclusion that [the municipality] was

deliberately indifferent to the need to train . . . and that this failure to train was the actual cause of

the plaintiffs' injuries.").

The present case is somewhat similar to the situation at issue in DiJoseph v. City of

Philadelphia, 947 F. Supp. 834 (E.D. Pa. 1996), *aff'd*, 156 F.3d 1224 (3d Cir. 1998).  In that case,

the Court found as follows.

> In the present case, DiJoseph has produced no probative
> evidence concerning the nature and quality of the Philadelphia Police
> Department's present training program concerning mentally disturbed
> individuals or barricaded persons.  In making his case of municipal
> liability, DiJoseph incorrectly focuses upon the actions of the officers
> instead of the policies of the city and, hence, improperly extrapolates
> his experience with police officers as an indicia of inadequate police
> training citywide.  For example, DiJoseph's expert witness, Dr.
> Leonard Territo, asserts that Officers Mattiacci and Hairston were not

properly trained in how to deal with emotionally disturbed individuals given the way they acted in this situation. Under Canton, DiJoseph cannot properly demonstrate that the City failed to train its police officers simply through proffering one example of police misconduct. That alone is insufficient. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city." Under Canton, DiJoseph must show that the city had notice of the problems arising from inadequate police training concerning mentally disturbed individuals and barricaded persons and that the city nonetheless made a conscious decision not to address those problems. In this case, however, DiJoseph establishes no such prior history of this problem nor does he illustrate how the city failed to respond to it.  Although DiJoseph casts considerable doubts upon whether the officers on duty implemented improper procedures, Monell made clear that "a municipality cannot be held liable solely because it employs a tortfeasor."

In the second step in establishing municipal liability, DiJoseph must show that the identified inadequacy in the police training program caused his ultimate injuries.  Because DiJoseph does not demonstrate the inadequacy of the present training program, however, he cannot illustrate how such inadequacy caused his injuries. Hence, DiJoseph's § 1983 claim against the City fails, and I will grant its Motion for Summary Judgment on this matter.

DiJoseph v. City of Philadelphia, 947 F.Supp. at 842 -843 (internal citations and footnote omitted)

Here, Plaintiff similarly has produced no probative evidence concerning the nature and quality of PHS training program.  Like DiJoseph, Plaintiff incorrectly focuses upon the actions of the individuals involved instead of the policies of PHS and, hence, improperly extrapolates his experience as an indicia of inadequate training. Like DiJoseph, Plaintiff  cannot properly demonstrate that PHS failed to train its employees and/or contractors simply through proffering one example. That alone is insufficient.  That a particular person may be unsatisfactorily trained will not alone suffice to fasten liability.  Plaintiff must show that PHS had notice of problems arising from inadequate training of its contract medical providers and that PHS nonetheless made a conscious

decision not to address those problems.  In this case, like <u>DiJoseph,</u> Plaintiff has failed to  establish any such prior history; nor does he illustrate how PHS failed to respond to it.

Simply stated, there is no evidence before this Court upon which to hold PHS liable based on any custom or policy.  Rather, the evidence shows that Plaintiff's right eye could not be corrected through a contact lens and that he might benefit from corneal surgery but that procedure is a last resort when a person's eyesight can be corrected through a contact lens and there is no imminent danger of losing the uncorrectable eye.  Here, Plaintiff's eyesight was correctable though a specially designed contact lens on his left eye.  While it is regrettable that there was a substantial delay in receipt of his lens, his vision was markedly improved after he was given his lens in November of 2006.  Thus, the record does not support Plaintiff's assertion that a corneal transplant was medically necessary at any time before this lawsuit was filed.  Rather, all the documentation shows is that such a procedure was the only thing that would improve Plaintiff's vision in his right eye.  It does not lead one to conclude that such a procedure was medically necessary and, in fact, no expert has so concluded.  Plaintiff's expert, Dr. Siviglia, informed Plaintiff that a corneal transplant was not indicated when vision was correctable through contact lenses.  Plaintiff makes much of the fact that Dr. McClure did not do corneal transplants but that does not mean he would not recommend one if it was indicated and he in fact testified that he would so recommend.  Plaintiff has not pointed to any PHS policy that would lead a reasonable juror to conclude that PHS outside specialists only recommend medical treatment that they themselves are able to provide.  Plaintiff also makes much of the fact that Dr. McClure did not discuss treatment options with Plaintiff and did not initiate any treatment on his own.  Other than Dr. McClure's subjective belief, there is no evidence that this is PHS policy.  Nor is there any evidence that such policy, even if it exists, constitutes deliberate indifference.  Providing medical care to anyone involves recommendations

32

and approvals from the requisite authorities, be it an insurance company or otherwise.  While
Plaintiff wanted a corneal transplant, and ultimately received a corneal transplant, there simply is
nothing in the record to find that PHS (or anyone else for that matter) was deliberately indifferent
for failing to insure that Plaintiff receive one prior to the time this lawsuit was initiated.  Because
Plaintiff does not establish a constitutional violation, he likewise does not establish that PHS was
the "moving force" behind a constitutional violation. *See* <u>Startzell v. City of Phila.</u>, 533 F.3d 183,
204 (3d Cir.2008). Accordingly, I will grant the motion for summary judgment as to liability against
PHS.

An appropriate order follows.


Dated: December 23, 2009                                      By the Court

_____

Lisa Pupo Lenihan
United States Magistrate Judge